JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Lamar Speights appeals from his conviction for sexual imposition. For the reasons set forth below, we affirm.
 {¶ 2} On August 19, 2005, defendant was indicted for one count of rape and one count of kidnapping with a sexual motivation specification in connection with the alleged multiple assailant assault on a thirteen year-old girl.[1] Defendant pled not guilty and the matter proceeded to a jury trial on October 4, 2005.
 {¶ 3} The state presented the testimony of the girl, her social worker, a sexual abuse social worker, her friend Isonna Johnson, her cousin Delores Dees, and Cleveland Police Detective Jody Remington.
 {¶ 4} The girl testified that in April 2005, when she was living with her cousin, she and her friend Isonna cut school and went to "Spud's" apartment on East 99th Street and St. Clair. The girl had never met Spud before but had called him for several weeks. When she and Isonna arrived, Spud's brother Bud and their mother were present but after approximately one hour, the boys' mother left the apartment.
 {¶ 5} The girl testified that she was wearing three pairs of pants. She removed the outer pants which were from her school uniform.
 {¶ 6} Spud's cousin Tyree arrived and the girl and Spud subsequently went into Spud's bedroom and they began to have sex. Afterward, the girl dressed. At this point another boy who was tall with dark skin and braids came in and pushed her on the bed. Other boys entered the room, held her down and pulled off her jeans. The boy with the braids then raped her as did the others, including Bud. The girl testified that she called out for Isonna but no one came to help her. When the boys finally stopped, she left the bedroom. Her jeans were ripped. Another girl in the apartment mocked her. Isonna threw the girl's backpack off of the porch. A third girl gave her money and arranged for her to use a telephone.
 {¶ 7} The girl called a relative named Connie. The girl got on a bus and Isonna and some of the boys boarded the same bus. One boy asked if the girl was going to tell on him. Isonna accompanied the girl to Connie's house. The girl's cousin James explained that the family had been looking for her and the girl told him what had happened.
 {¶ 8} The girl and Isonna then went to the girl's aunt's house. She told her aunt and her cousin, Delores, that she had been gang-raped and she then called her mother. Delores took the girl to the Cleveland Clinic.
 {¶ 9} The girl identified Spud in a photographic array. She testified that defendant is "Bud," one of the boys who raped her.
 {¶ 10} The girl admitted that she told Spud that she was seventeen years old. She also admitted that on the day she skipped school, she had planned to run away and stay with Spud and that was why she had extra clothing.
 {¶ 11} The girl also admitted that she had made two different statements to police and that she was not truthful in her first statement. Within this document, she did not tell the police that she had been the one to initiate contact with Spud. She also failed to mention that she asked Spud if they could have sex. Although her medical records indicate that there were a total of eighteen assailants, she stated that she never made this claim at the hospital. The girl admitted that she got in trouble with her family for running away and skipping school.
 {¶ 12} Social worker Sharon Hayes testified that, on the day of the incident, she was looking for the girl and instructed the family members with whom she was living to notify the police that the girl was missing. Hayes later learned that the girl had been found and was taken to the hospital. The girl was then referred to sex abuse social worker Arlene Spencer and was eventually placed in foster care in the Youngstown area.
 {¶ 13} Hayes' risk assessment for the family prior to the incident was "intensive," i.e., meaning the highest risk that abuse or neglect would recur in the family. Hayes also noted family stressors of allegations of substance abuse and domestic violence, inadequate basic needs and inadequate supervision. After the girl was placed with family members, the risk assessment remained "intensive." By March of 2005, reunification of the family was not a feasible goal and the mother agreed to terminate custody.
 {¶ 14} Sexual abuse social worker Arlene Spencer testified that she spoke with the girl and her siblings and a family member with whom the girl was living. Spencer testified that the girl seemed emotionally disconnected from her allegations. In an initial interview, the girl told her that there were eight to ten perpetrators, but later, she indicated that there were eighteen. Spencer received the girl's medical records and referred the girl for intensive counseling. Although the girl sometimes appeared confused about the allegations, Spencer opined that sexual abuse was indicated.
 {¶ 15} Isonna testified that she and the girl skipped school. The girl was planning on running away to Isonna's house, then decided to go to Spud's house. After they arrived at Spud's house, Isonna wanted to return to school but the girl wanted to stay. The girl changed her clothes in a nearby hallway. When they got inside, there were two girls, Spud, defendant, and defendant's mother.
 {¶ 16} Defendant and his mother subsequently left and Isonna and one of the girls went to a downstairs apartment and smoked marijuana. Later, two more friends, Tyree and Jaja came over and Spud and the girl went into a bedroom while the others remained in the TV room. Tyree suddenly left the TV room to check on the girl and Spud. A few minutes later, approximately seven other boys arrived and went towards the room where the girl and Spud were.
 {¶ 17} Later, the boys went to the kitchen, and according to Isonna, they held her down and took her earrings. Spud subsequently left to go to the store and the boys went to the bedroom. Isonna heard "belt smacks." The girl called for Isonna, and appeared to be laughing. Tyree told Isonna not to go in the room. The boys then left and Spud prepared to go to a party. Jaja then sprayed disinfectant onto the girl and threw her belongings off of the porch. The girl buttoned up her pants as she exited the room and appeared to be acting normally but was walking funny.
 {¶ 18} According to Isonna, they were at Spud's apartment for twelve or thirteen hours.
 {¶ 19} Delores Dees testified that the girl is her cousin. Dees spoke to the girl after she arrived home. At this time, the girl was crying, and Dees took her to the hospital.
 {¶ 20} Det. Jody Remington testified that she took two statements from the girl. She also interviewed defendant. In his statement, defendant indicated that after the other boys arrived at the apartment, they went into the bedroom where the girl was one by one. He went into the room and asked the girl if she wanted to have sex. She said no and, according to defendant, she then manually stimulated him. Defendant ejaculated and the girl did it again and asked defendant to bring her other panties from her backpack.
 {¶ 21} Defendant also stated that Jaja then taunted the girl and she left and defendant spent the night at his friend R.C.'s house.
 {¶ 22} Other records submitted into evidence indicated that the girl had suffered vaginal tearing, and that DNA evidence was consistent with defendant's DNA profile and did not exclude defendant as the source of semen on vaginal swabs, rectal swabs, swabs from a condom, and tissue found on the bedroom floor. Other sources of DNA were also recovered. Defendant was convicted of one count of sexual imposition, in violation of R.C. 2907.06 and was sentenced to a sixty day jail term.[2] The court also determined that defendant is a sexually oriented offender. He now appeals and contends that the conviction is against the manifest weight of the evidence.
 {¶ 23} In State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 24} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." Black's [Law Dictionary (6 Ed. 1990)], at 1594."
 {¶ 25} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,45, 102 S. Ct. 2211, 2220, 72 L.Ed.2d 652, 663. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Martin (1983), 20 Ohio App. 3d 172, 175,485 N.E.2d 717, 720-721.
 {¶ 26} The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 27} R.C. 2907.06, Sexual Imposition, states:
 {¶ 28} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 29} "(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard."
 {¶ 30} In this matter, we cannot say that the trial court lost its way and created a manifest miscarriage of justice in convicting defendant of sexual imposition. The evidence presented by the state indicated that a group of boys went to the room and had sex with the thirteen year old, at a place where she had never been before and, and although she had called for her friend, her friend did not respond. The greater amount of credible evidence indicated that no one came to her aid. Although defendant claimed that the girl initiated their encounter, he admitted that each of the boys had entered the room sequentially, and it was obvious that sexual conduct had occurred. He also admitted that he remained there even though the girl said that she did not want to have sex. It was also established that the zipper of the pants she was wearing was broken. From the foregoing, the trial court properly determined that defendant had sexual contact with the girl, knowing or in reckless indifference to whether the contact was offensive to the girl.
 {¶ 31} The assignment of error is without merit. Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to
Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., J., and Rocco, J., Concur.
[1] In guidelines adopted in 2001, this Court generally omits the proper names of child crime victims.
[2] Defendant was subsequently released. This appeal is therefore not moot as there is no indication that he served his sentence.